1
2
3
4
5
6
7

8                       UNITED STATES DISTRICT COURT

9                       EASTERN DISTRICT OF CALIFORNIA

10

11    JARROD HOEFLE,                          )   Case No.: 1:12-cv-01719 - JLT
                                              )
12                   Plaintiff,               )   ORDER REMANDING THE ACTION PURSUANT
                                              )   TO SENTENCE FOUR OF 42 U.S.C. § 405(g)
13            v.                              )
                                              )   ORDER DIRECTING ENTRY OF JUDGMENT IN
14    CAROLYN W. COLVIN,                      )   FAVOR OF PLAINTIFF JARROD HOEFLE AND
      Acting Commissioner of Social Security, )   AGAINST DEFENDANT CAROLYN COLVIN,
15                                            )   ACTING COMMISSIONER OF SOCIAL
16                   Defendant.               )   SECURITY
                                              )
17    _____    )

18            Jarrod Hoefle ("Plaintiff") asserts he is entitled to benefits and under Titles II and XVI of the

19    Social Security Act, and seeks judicial review of the decision of the administrative law judge ("ALJ")

20    who concluded he was not disabled.  For the reasons set forth below, the action is **REMANDED** for

21    further proceedings pursuant to sentence four of 42 U.S.C. §495(g).

22                            **PROCEDURAL HISTORY**[1]

23            Plaintiff filed applications for disability insurance benefits and supplemental security income

24    on January 9, 2007.  AR at 45-56, 91.  The Social Security Administration denied his application at the

25    initial level on August 3, 2007, and upon reconsideration on December 11, 2007.  *Id.* at 34-38, 40.

26    After requesting a hearing, Plaintiff testified before ALJ November 25, 2008.  *Id.* at 272.  The ALJ

27

28            [1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

                                              1

1  determined Plaintiff was not disabled under the Social Security Act, and issued an order denying

2  benefits on April 21, 2009.  *Id.* at 189-200.

3          Plaintiff requested review by the Appeals Council, which granted his request.  AR at 208-211.

4  The Appeals Council observed that the ALJ "did not evaluate the opinion of Dr. David Browne, the

5  claimant's treating psychiatrist."  *Id.* at 209.  In addition, the ALJ rejected the opinion of Plaintiff's

6  treating physician, but the Appeals Council observed the opinion "does not appear to be inconsistent

7  with that of the treating psychiatrist, Dr. Browne."  *Id.* at 210.  Therefore, the Appeals Council vacated

8  the ALJ's decision and remanded it for further consideration, directing the ALJ to reevaluate the

9  medical evidence and to "[o]btain supplemental evidence from a vocational expert to clarify the effect

10  of the assessed limitations on the claimant's occupational base."  *Id.*

11         Upon remand, Plaintiff testified at a second hearing on October 20, 2010.  AR at 310.  The ALJ

12  issued an unfavorable decision on January 14, 2011, again finding Plaintiff was not disabled as defined

13  by the Social Security Act.  *Id.* at 10-21. The Appeals Council denied Plaintiff's request for review on

14  August 20, 2012.  *Id.* at 4-6.  Therefore, the ALJ's decision dated January 14, 2011 became the final

15  decision of the Commissioner of Social Security ("Commissioner").

16                                        **STANDARD OF REVIEW**

17         District courts have a limited scope of judicial review for disability claims after a decision by

18  the Commissioner to deny benefits under the Social Security Act.  When reviewing findings of fact,

19  such as whether a claimant was disabled, the Court must determine whether the Commissioner's

20  decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g).  The ALJ's

21  determination that the claimant is not disabled must be upheld by the Court if the proper legal standards

22  were applied and the findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health &*

23  *Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

24         Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a

25  reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S.

26  389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  The record as a whole

27  must be considered, because "[t]he court must consider both evidence that supports and evidence that

28  detracts from the ALJ's conclusion."  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

**DISABILITY BENEFITS**

To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).  The burden of proof is on a claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).  If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment.  *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

**ADMINISTRATIVE DETERMINATION**

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability.  20 C.F.R. §§ 404.1520, 416.920 (a)-(f).  The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level.  *Id.*  The ALJ must consider testimonial and objective medical evidence.  20 C.F.R. §§ 404.1527, 416.927, 416.929.

**A.    Relevant Medical Evidence**

In February 2002, Plaintiff began treatment with Dr. Ralph Retherford, who noted Plaintiff began taking Ritalin when he was six years old.  AR at 265.  Plaintiff "tried going off Ritalin twice in [the] past 2 years."  *Id.* at 264-65.  However, Plaintiff reported that when he stopped taking Ritalin, he "got anxious & paranoid."  *Id.* at 265.  Dr. Retherford diagnosed Plaintiff with ADD, anxiety, and depression.  *Id.* at 248.  From 2002 to 2005, Dr. Retherford continued to prescribe Ritalin and Paxil for

1    Plaintiff.  *Id.* at 262-63.

2          In April 2005, Dr. Retherford noted Plaintiff was "doing quite well finishing his first year out at

3    Columbia College."  AR at 259.  Plaintiff told Dr. Retherford that his psychiatrist Dr. Schorr at

4    Psychiatric Medical Group ("PMG") had increased the dose of Ritalin "from 20 mg tid to 30 mg tid."

5    *Id.*  Dr. Retherford observed Plaintiff's exam was "unremarkable" and Plaintiff was "mentally clear."

6    *Id.*  He reduced Plaintiff's dose of Ritalin down to 20 mg tid.  *Id.*  However, in June, Plaintiff reported

7    was "unable to concentrate, moody and in general miserable" while on the lower dose.  *Id.*  Therefore,

8    Dr. Retherford increased the dose to 30 mg tid.  *Id.*

9          In September 2005, Plaintiff reported he had "been out of his Depakote for a couple of weeks

10   and his mood swings have been worse."  AR at 258.  Dr. Retherford refilled Plaintiff's prescriptions for

11   Lexapro, Paxil, and Ritalin.  *Id.* Plaintiff was told "to phase gradually back onto the Depakote over a

12   few days."  *Id.*  In November 2005, Dr. Retherford observed Plaintiff was "less depressed, [in] better

13   spirits and in good shape physically."  *Id.* at 257.   Dr. Retherford noted Plaintiff "continue[d] to do

14   well on Ritalin 20 mg, 1 ½  tablets 3 times daily" in July 20, 2006.  *Id.*

15         On October 6, 2006, Plaintiff informed Dr. Banu Brar, a psychiatrist at PMG, that he wanted to

16   try to be off Ritalin, or at least decrease it.  AR at 182.  Dr. Brar observed Plaintiff was "very articulate

17   and talkative and easily volunteer[ed] information in a very intelligent fashion."  *Id.* at 185.  Further,

18   Dr. Brar observed Plaintiff's attention span was "good through out (sic) the interview."  *Id.*  Dr. Brar

19   noted Plaintiff had "[p]sychosocial stressors to include inattentiveness, poor working memory, [and]

20   significant anxiety interfering with his interpersonal areas," and diagnosed Plaintiff with attention

21   deficit hyperactivity disorder and generalized anxiety disorder.  *Id.* at 185-86.  Per Plaintiff's request,

22   Dr. Brar discontinued Plaintiff's Ritalin and substituted it with Concerta.  *Id.* at 186.

23         In January 2007, Dr. Retherford observed Plaintiff was "doing pretty well" but had not liked the

24   Concerta.  AR at 256.  His prescription for Concerta was discontinued, and he returned to Ritalin.  *Id.*

25   Also, Plaintiff ran out of Zyprexa "and got pretty moody."  *Id.*  In March 2007, Dr. Retherford noted

26   Plaintiff "was functioning better" for part of the past year, but was "incapable of concentration for

27   anything but brief periods, [was] easily distracted, [and] irritable."  *Id.* at 255.

28         On April 13, 2007, Dr. Retherford noted Plaintiff reported "feelings of extreme anxiety,

                                                4

spontaneous movements of his head, trouble concentrating, feeling confused and … a terrible feeling of anxiety with sensory overload of all his senses flooding in on him." AR at 255. Dr. Retherford was concerned that Plaintiff may be overmedicated, and suggested Plaintiff stop taking Paxil. *Id.* Also, Dr. Retherford reduced the dosage of Ritalin from 20 mg to 10 mg, but kept him on Lexapro, Zyprexa, and Depakote. *Id.* A week later, Dr. Retherford observed Plaintiff was "doing much better" without Paxil. *Id.* at 144, 254. Plaintiff reported that his insurance was about to expire, and requested that three months worth of medication. *Id.* Dr. Retherford noted Plaintiff's "refills on Ritalin should last him for the next 8 months, since he [would] be getting a 4 months (sic) supply at double the dose." *Id.*

Dr. Stefan Lampe completed a psychiatric consultative examination on July 14, 2007. AR at 151. He noted Plaintiff "suffers from Asperger's syndrome, and has also been diagnosed with a number of different psychiatric disorders, including bipolar disorder, OCD, and ADD." *Id.* Plaintiff told Dr. Lampe that he could get very down and depressed with "a sadistic sense of humor," and at other times he was "extremely happy." *Id.* Plaintiff reported that he liked "reading almost all books and watching television," and his hobbies included playing on the computer. *Id.* at 152. Dr. Lampe found Plaintiff "was oriented to person, place, time, and situation." *Id.* Plaintiff "was able to recall 3/4 objects after several minutes, and recalled the fourth one with a category prompt." *Id.* According to Dr. Lampe:

> The claimant can relate and interact with supervisors and co-workers. He can understand, remember and carry out simple as well as more complex instructions.
>
> He can deal with the public. He appears able to maintain concentration and attention for 2-hour increments. Whether or not he could withstand the stress and pressure of an 8-hour workday on an ongoing basis would depend, of course, on the skills necessary and the setting and the environment of his occupation.

*Id.* at 153. Dr. Lampe gave Plaintiff a GAF score of 50[2] and opined that "[w]ith treatment, []his… prognosis is good." *Id.* at 152.

On July 31, 2007, Plaintiff informed Dr. Retherford that he stopped taking Zyprexa because it

---

[2] GAF scores range from 1-100, and in calculating a GAF score, the doctor considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed.) ("DSM-IV). A GAF score between 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairments in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* at 34.

made him gain weight.  AR at 254.  Plaintiff continued "to take 2 to 3 20 mg Ritalin daily, 60 mg being the maximum dose per day," and that when he "trie[d] to cut down he can't function."  *Id.*

Dr. Harvey Bilik completed a psychiatric review technique form on August 2, 2007.  AR at 122-32.  He indicated Plaintiff suffered from an organic mental disorder (ADHD), an affective disorder (bipolar disorder, not otherwise specified), anxiety-related disorders (generalized anxiety disorder and obsessive-compulsive disorder) and a pervasive developmental disorder (Asperger's Syndrome).  *Id.* at 122, 125-26, 129.  Dr. Bilik determined Plaintiff suffered from a mild restriction in his activities of daily living; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace.  *Id.* at 131.  He noted Plaintiff was not being treated by a psychiatrist or psychologist, though he had prescriptions for Depakote, Zyprexa, Ritalin, and Lexapro. *Id.* at 132.  In addition, Dr. Bilik noted that the consultative examiner found Plaintiff was able to "perform [activities of daily living] and has a variety of interests."  *Id.*  He opined "the severity of symptoms alleged is not supported by signs and laboratory findings from evaluations by Drs. Lampe and Brar," and that Plaintiff "appear[ed] well stabilized on [the] current regime, with good prognosis. *Id.*  Therefore, Dr. Bilik concluded Plaintiff's mental impairments were not severe.  *Id.* at 122.

Plaintiff's treating physician, Dr. Retherford, sent a letter to the disability evaluation analyst on October 29, 2007.  AR at 143.  Dr. Retherford observed Plaintiff's "[u]nderstanding and memory are good, but sustained concentration and persistence are limited."  *Id.*  He explained Plaintiff was "severely hampered by his psychiatric diagnoses," and had to stop working in his family business cleaning floors "because of difficulty doing the tasks involved."  *Id.*  Dr. Retherford opined: "In the right setting he might be capable of doing some limited type of employment, but he will probably need considerable training and close supervision.  *Id.*

On November 14, 2007, Dr. David Browne completed a psychiatric review technique form, on which he indicated Plaintiff had an affective disorder characterized by anhedonia or pervasive loss of interest in almost all activities; sleep disturbance; psychomotor agitation or retardation; decreased energy; feelings of guilt or worthlessness; difficulty concentrating or thinking; and hallucinations, delusions, or paranoid thinking.  AR at 134.  In addition, Dr. Browne noted Plaintiff had a manic syndrome characterized by hyperactivity; pressures of speech; flight of ideas; easy distractibility; and

6

hallucinations, delusions, or paranoid thinking.  *Id.*  He diagnosed Plaintiff with a bipolar syndrome,

noting Plaintiff had both manic and depressive syndromes.  *Id.*  Dr. Browne opined Plaintiff had

extreme limitations in his activities of daily living; difficulties in maintaining social functioning; and

difficulties in maintaining concentration, persistence, or pace.  *Id.* at 135.  Further, he noted Plaintiff

had a medically documented history of chronic organic mental disorder, demonstrated by his current

history of one or more years' inability to function outside a highly supportive living arrangement and

continued need for such an arrangement.  *Id.* at 136.  According to Dr. Browne, Plaintiff had "[n]o

ability" to relate and interact with supervisors and co-workers, and it "would be impossible" for

Plaintiff to understand, remember, and carry out simple one-or-two step job instructions.  *Id.* at 137.

Further, Dr. Browne opined Plaintiff "would not be very good" at dealing with the public, and that it

was "impossible" for Plaintiff  to maintain concentration and attention for at least two hours or handle

the stress associated with an eight-hour work day.  *Id.* at 137.  Dr. Browne noted Plaintiff requested to

be taken off Zyprexa due to its side effects, and he prescribed Abilify as a replacement.  *Id.* at 246.

Dr. Archimedes Garcia completed a psychiatric review technique form and residual functional

capacity assessment on November 26, 2007.  AR at 110- 20, 139-41.  Dr. Garcia indicated Plaintiff had

an affective disorder, and believed Plaintiff had a mild restriction in activities of daily living.  *Id.* at

110, 118.  In addition, Dr. Garcia opined Plaintiff was "not significantly limited" in his ability to

understand, remember, and carry out very short and simple instructions.  *Id.* at 139.  However, he

believed Plaintiff was "moderately limited" in his ability to understand, remember, and carry out

detailed instructions.  *Id.*  According to Dr. Garcia, Plaintiff was "not significantly limited" in all other

areas of concentration and persistence, social interaction, and adaptation.  *Id.* at 139-40.  Specifically,

Dr. Garcia opined Plaintiff was:

    A.  Able to understand and remember work locations and procedures of a simple, routine nature involving 1-2 step job tasks and instructions.

    B.  Able to maintain concentration and attention for above in 2 hour increments.  Would be able to sustain 8 hr/40 hr work schedules on a sustained basis.

    C.  Able to relate to and accept direction from supervisors.  Would be able to remain socially appropriate with co-workers and the public without being distracted by them.

    D.  Able to travel, avoid workplace hazards, respond appropriately to change and set realistic goals independently.

1   *Id.* at 141.  Accordingly, Dr. Garcia concluded a limitation to simple repetitive tasks appeared to be

2   "appropriate" for Plaintiff.  *Id.* at 108.

3           On December 12, 2007, Dr. Browne had a follow-up appointment with Plaintiff to evaluate his

4   psychiatric medications.  AR at 237, 246.  Plaintiff reported taking Paxil "made a big difference in his

5   anxiety."  *Id.* at 237.  In addition, in January 2008, Plaintiff reported Depokote was "very helpful" and

6   his "moods were better."  AR at 236. Plaintiff continued to take Paxil, Ritalin, Abilify, and Lexapro. *Id.*

7   Dr. Retherford observed Plaintiff was "doing pretty well" with the medication.  *Id.* at 253.

8           In April 2008, Plaintiff reported he wanted to lower his dosage of Depokote, but had not been

9   able to do so.  AR at 235.  In addition, Plaintiff informed Dr. Browne that he ran out of Paxil, which

10  "caused increased levels of anxiety and pain."  *Id.*

11          In June 2008, Dr. Retherford noted Plaintiff was still being treated by Dr. Browne, and was

12  "doing pretty well on his medication."  AR at 253.  In July, Dr. Browne noted that Plaintiff had been

13  able to lose weight and his heart rate lowered after he was taken off Depokote.  *Id.* at 234.  In addition

14  Plaintiff reported that his emotions were "better than they have been in a long time."  *Id.*

15          In September 2008, Plaintiff reported that he had been waking up in the morning "unable to

16  move or talk."  AR at 253.  He said that once he started talking, "his speech [was] hard to understand."

17  *Id.*  If he took Ritalin "first thing in the morning," the symptoms would "clear up within 30 minutes to

18  an hour or at least [we]re much improved."  *Id.*  Dr. Retherford consulted with Dr. Browne, and both

19  agreed Plaintiff "should immediately stop the Abilify."  *Id.*  At a follow-up appointment the next

20  week, Dr. Retherford noted Plaintiff's facial immobility had "improved markedly."  *Id.* at 252.

21  However, Plaintiff reported he was "a bit more anxious and had a bit more obsessive/compulsive

22  behavior since stopping the Abilify."  *Id.*

23          On November 19, 2008, Dr. Browne observed Plaintiff "had many more problems" with

24  impulsiveness and obsessive behavior and was "doing poorly since he had to stop Abilify." AR at 233.

25  Dr. Browne changed Plaintiff's prescription to Geodon.  *Id.* at 233, 252.  At a follow-up appointment,

26  Plaintiff reported he had "muscle stiffness—tightening," hypertension, and dizziness since Geodon was

27  added to his regimen.  *Id.* at 271.  Dr. Browne noted Plaintiff no longer took Depokote and prescribed

28  Cogentin.  *Id.*

Dr. Retherford opined Plaintiff "qualifie[d] for permanent disability due to severe psychiatric illness" on November 21, 2008.  AR at 244.  He observed Plaintiff "require[ed] several medications to be able to function" and had suffered "serious side effects" due to his medication.  *Id.*  He affirmed this opinion on January 2, 2009, indicating on Plaintiff's application for a food stamp program that he believed Plaintiff was permanently unfit for gainful employment.  *Id.* at 242.

In January 2009, Plaintiff reported having dry eyes and mouth since starting Cogentin, and had "hives on [his] hands and all over his body."  AR at 269.  However, Plaintiff said he was functioning better and was able to due chores around the house, and did not want to stop the medicine.  *Id.*  According to Dr. Retherford, Plaintiff appeared "unbathed, malodorous and wearing filthy clothing" in February, complaining he "had a difficult time controlling his emotions" after breaking out in hives.  *Id.* at 251.  In addition, Plaintiff reported "feeling depressed, irritable, and moody."  *Id.*  Dr. Retherford noted Dr. Browne had added Benzotropin to Plaintiff's regimen, and informed Plaintiff that they could not "just keep covering up his emotional symptoms with stronger and stronger drugs."  *Id.*

In March 2009, Plaintiff continued to complain of "emotional outbursts, abnormal thoughts, [and] angry thoughts."  AR at 268.  Plaintiff requested to switch from Geodon to Seroquel, as previously suggested by Dr. Browne.  *Id.* at 268-69.  In July 2009, Dr. Browne noted Plaintiff's mother had died.  *Id.*

In September 2009, Plaintiff requested a prescription for Ritalin from Dr. Retherford, who noted Plaintiff needed a Treatment Authorization Request under the County's medical program.  AR at 250.  Dr. Retherford believed "it would be preferable for [Dr. Browne] to remain in control of Jarrod's medications."  *Id.*  However, Dr. Browne informed Dr. Retherford that it was "difficult…without a staff" to prescribe Plaintiff's medication on a monthly basis, and Dr. Retherford agreed to take over the monthly prescriptions for Ritalin.  *Id.*

In June 2010, Dr. Retherford observed Plaintiff was "doing well" and reported that he was "doing some volunteering out at the college doing some tutoring."  AR at 249.  Also, Dr. Retherford believed Plaintiff appeared "in good spirits."  *Id.*  On September 20, 2010, Dr. Browne noted Plaintiff "ha[d] been stable" and was "doing a little better."  *Id.* at 266.

///

1    **B.      Administrative Hearing Testimony**

2         1.      November 25, 2008

3         Plaintiff testified that he graduated from high school and attended a junior college, although he

4    did not graduate.  AR at 277.  He said that he began taking Ritalin when he was six years old, but was

5    never in special education classes.  *Id.* at 283. Plaintiff explained that his "mind and intellect was never

6    impaired" but he "constantly had people helping [him]" because he was unable to concentrate or focus.

7    *Id.*  Plaintiff said his aunt was a special-ed worker at his school, and "[s]he helped make sure [the]

8    medications were taken every single day," and helped him stay in the regular classes.  *Id.*  Plaintiff said

9    he got "As and Fs," depending on the type of day he had in school. *Id.* at 283-84.

10        Plaintiff believed he was unable to work because he had a "[c]omplete lack of control of

11   emotions, a bipolar-almost disorder, inability to concentrate for more than…20 minutes – at any given

12   thing."  AR at 279-80.  He explained his emotions were "so out of control" and he went from "be[ing]

13   quite happy, very almost euphoric" to feeling as though he had "tumble[d] into a hole that you just

14   can't seem to get out of."  *Id.* at 280-81.  He testified he went though a "full cycle" of these emotions

15   in "about an hour," but he had them at least once a day.  *Id.* at 281.  He said his "depression and

16   sadness can last for days afterwards if it's bad enough, and each time getting worse, especially if

17   something happens and [he is] not able to take control."  *Id.* In addition, Plaintiff said he suffered from

18   a compulsive disorder.  *Id.* at 387.

19        He reported he was receiving treatment from Dr. Browne, a psychiatrist, and Dr. Retherford, a

20   general practitioner.  AR at 280, 282.  Plaintiff said he took "Methylphenidate, which is generic for

21   Ritalin, for attention deficit hyperactivity disorder;" Paxil and Citalopram for anxiety and depression;

22   and a new "antipsychotic drug" that replaced Abilify.  *Id.* at 281. He reported the medication had side

23   effects including insomnia, "high blood pressure, high heart rate, [and] lack of appetite."  *Id.* at 293.

24        Plaintiff stated that on a typical day, he woke up at 11:00 a.m. and would "take [his] medicine

25   right off."  AR at 284.  He said that for the next hour, before the medicine started affecting him, he felt

26   "awful," and as though he was "totally out of control."  *Id.*  Plaintiff reported the hour was "spent

27   pacing;" though he would "try to play videogames or read or do something," he was only able to do so

28   "for about five minute increments."  *Id.*  Plaintiff said he was "usually feeling very happy" around

10

noon, and the feeling lasted "for about two hours." *Id.* at 284-85.  Plaintiff testified that he spent these

hours with his parents, because his mother had cancer and he wanted to "spend as much time with her

as [he] can during those good periods." *Id.* at 285.  In addition, Plaintiff said he attempted to do chores

such as loading the dishwasher, taking out the garbage and bringing in firewood, but "usually [did]

them halfway or … in three times the length of what it should take." *Id.*  He stated that he "start[ed]

having a noticeable decrease in []his happiness level" around 3:00 p.m. when he had to take another

dose of Ritalin. *Id.*  He reported that for the rest of the day he would try to entertain himself by reading

"anything from history books to romance novels to sci-fi books to …'Star Wars' books," playing video

games, or taking a walk. *Id.* at 286.  Plaintiff said he took a third dose of Ritalin around 6:00 or 7:00

p.m., after which he spent time with his family. *Id.*

     Plaintiff testified he did not have difficulty with standing, but standing still was a problem

because he had "to be constantly moving … from one place to another." AR at 289.  He explained he

had three televisions in his room "so that [he] can get up, walk from one to the other and never stay

more than 20 minutes at one" when he played video games. *Id.* Plaintiff said he had a similar problem

trying to sit still, and would "constantly move his hands." *Id.*  He estimated that his "general

concentration is about 20 minutes," but believed he could concentrate for "[a]bout 30 minutes" on a

video game because he was "very fond of electronics." *Id.* at 291.

     He reported that he used to attend church, but stopped going because "[i]t just started getting

too crowded" and he "became extremely anxious." AR at 290.  Plaintiff said he could not sit still, and

with all the people, he had no place to move. *Id.*  In addition, he explained that he tried "to avoid large

crowds" whenever possible, and limited his trips to the store or other places. *Id.* at 291.  However,

Plaintiff said that he liked to volunteer at a place called Inner Faith when he was feeling good in the

first couple hours of his day. *Id.*  He stated that his primary tasks as a volunteer included gathering

firewood, stacking and/or sorting canned goods, and cleaning up the facilities. *Id.*  Plaintiff said he

was "always… with somebody" who kept him on track with his duties at Inner Faith. *Id.*

     Similarly, Plaintiff stated that when he held "an in-home support services job" taking care of

his grandparents for approximately one year, his parents helped by making "certain that [he had] done

the things that [he] was supposed to and didn't forget." AR at 278, 294.  In addition, he reported that

his sisters would go and check on him as well, ensuring that he was doing the job correctly. *Id.* at 294. Plaintiff stated that he stopped working after his grandfather died because he "was having problems remembering to take care of his grandmother." *Id.* at 279.

Vocational expert David Dettmer stated the *Dictionary of Occupational Titles*[3] identified Plaintiff's work as a "home health aide," *DOT* 354.377-014. AR at 296. Mr. Dettmer explained this position was classified as involving medium exertion[4], and required an SVP 3[5]. *Id.*

The ALJ asked Mr. Dettmer to consider a hypothetical individual the same age as Plaintiff, with a high school education and similar past work. *Id.* In addition, the ALJ stated the individual had "no exertional limitations but would be limited to work involving relatively simple instructions and having relatively restricted contact with the public." *Id.* Mr. Dettmer opined that an individual with these limitations could perform work within the national economy, and identified examples including hand packager, *DOT* 920.587-018; production helper, *DOT* 529.686-070; housekeeping, *DOT* 323.6878-104; and mail clerk, *DOT* 209.687-026. *Id.*

2.      October 20, 2010

After the Appeals Council vacated the ALJ's decision and remanded the action back to the ALJ, Plaintiff testified at the second administrative hearing. AR at 303. Again, Plaintiff testified regarding his past work providing in-home care for his grandparents and stated that he stopped when he "became unable to concentrate on things for long periods of time," and believed he "wasn't capable of taking care of them any longer, at least not safely." *Id.* at 307.

Plaintiff stated he was still being treated by Dr. Browne and Dr. Retherford, but "not as much as [he] want[ed]" because it got "harder and harder" to pay for medication after the death of his mother. AR at 309. He explained he saw Dr. Retherford "for a face-to-face visit… once every three

---

[3] *The Dictionary of Occupational Titles* ("*DOT*") by the United States Dept. of Labor, Employment & Training Admin., may be relied upon "in evaluating whether the claimant is able to perform work in the national economy." *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990). The *DOT* classifies jobs by their exertional and skill requirements, and may be a primary source of information for the ALJ or Commissioner. 20 C.F.R. § 404.1566(d)(1).

[4] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c), 416.967(c).

[5] "SVP," or specific vocational preparation, is defined as the amount of lapsed time required by a typical worker to learn techniques, acquire information, and develop the facility needed for average performance in a specific job position. Employment and Training Admin., U.S. Dep't of Labor, *Dictionary of Occupational Titles*, (4th ed. rev. 1991), page 1009.

1    months," although his Ritalin needed to be refilled each month.  *Id.* at 309-10.  In addition, Plaintiff

2    said he had decreased his visits with Dr. Browne, the psychiatrist, to "about once every six months"

3    because "[a]ny more than that, and it would bankrupt the family."  *Id.* at 310.

4           He testified that he lived in a trailer by himself on his family's property, but his family helped

5    with meals.  AR at 310-11.  Plaintiff said that he attempted to get up each day at a certain time, get on

6    a bus to town "and see several friends."  *Id.* at 311.  Plaintiff explained that though he was not "able to

7    work or concentrate very long, ... history seem[ed] to be easy … to remember."  *Id.*  He explained that

8    one of the ways he calmed his mind was "through learning about – anything about history," and that

9    he learned as much history as he could.  *Id.* at 311-12.  As a result, Plaintiff would help his friends that

10   were in college with their history classes.  *Id.* at 311.  Plaintiff explained his friends had learned to put

11   up with him, though he was "often blunt and unable to exist in most social situations."  *Id.* at 214.  He

12   explained he had a "severe obsessive-compulsive disorder," which meant: "Half the time I'm doing

13   things because it's what I have to do and I've always done [it] and there's no other way around it."  *Id.*

14          Plaintiff explained that his mother was the one to "bring [him] out," and he left home during

15   the day so he would not "stay home and feed the depression."  AR at 314.  However, Plaintiff said he

16   did not want to be around people, and would not go shopping, eat out, or go to the movies.  *Id.* at 315.

17   He explained that being around others "causes more stress and anxiety," which made him feel like his

18   "heart wants to explode" and his body was paralyzed.  *Id.*  Plaintiff testified that he had those feelings

19   every day due to stress and a lack of stability since his mother's death.  *Id.* at 315-16.  Although the

20   ALJ questioned Plaintiff about his physical abilities, Plaintiff responded: "Never have I alleged that I

21   was physically disabled.  Ye[s] I have problems, just like you've asked, but are they the basis of why I

22   believe I'm disabled?  No, not at all."  *Id.* at 317.

23          Vocational expert Steven Schmidt testified after Plaintiff, and identified Plaintiff's past

24   relevant work as a "home attendant," *DOT* 354.377-014.  AR at 318.  The ALJ asked Mr. Schmidt to

25   consider an individual the same age as Plaintiff (24 years old) with a high school education and same

26   past work.  *Id.*  In addition, the ALJ specified that the hypothetical worker had "no exertional

27   limitations" but "mentally this person would be limited to work involving simple instructions and

28   having restricted contact with both the public and coworkers."  *Id.*  The ALJ explained: "By 'restricted

                                                       13

contact with coworkers,' he can work in the presence of others but should not be part of a work team or cooperative work process." *Id.* Mr. Schmidt opined that an individual with these limitations could perform work. *Id.* As examples, Mr. Schmidt identified work requiring at SVP level 2 including commercial cleaner, *DOT* 381.681-014; store laborer, *DOT* 922.687-058; and dishwasher, *DOT* 318.687-010. *Id.*

Next, the ALJ asked Mr. Schmidt to consider an individual for whom "it would be impossible to maintain attention and concentration for two-hour increments," as Plaintiff's treating physician opined. AR at 319. Mr. Schmidt opined such a person would not be able to perform the jobs he identified, or any other work in the national economy. *Id.* Similarly, Mr. Schmidt opined that an individual who had a GAF score of 50 and "wouldn't be able to handle the stress of completing a full eight-hour workday" could not perform work in the national economy. *Id.*

**C.      Lay Witness Statement**

John Hoefle, Plaintiff's father, sent a letter to the Appeals Council regarding his son's mental impairments. AR at 206. Mr. Hoefle reported Plaintiff was home-schooled during part of first grade "instead of confining him to a three foot circle to run around his desk." *Id.* Plaintiff returned to school in the second grade after he was given Ritalin for his ADHD. *Id.* However, Mr. Hoefle stated Plaintiff "was removed from school once again during fifth grade and did not go back to public school till (sic) his junior year of high school." *Id.* Mr. Hoefle reported that Plaintiff "had immense problems dealing with people at the school and even got into a couple fights with other students." *Id.* Mr. Hoefle noted Plaintiff was placed on academic probation while attending Columbia College, and then suspended. *Id.*

**D.      The ALJ's Findings**

First, the ALJ determined Plaintiff had not engaged in substantial gainful activity since his alleged onset date of October 1, 2006. AR at 15. At step two, the ALJ found Plaintiff had severe impairments including "attention deficit hyperactivity disorder, depression, and anxiety." *Id.* These impairments did not meet or medically equal a listing, including Listing 12.04 and Listing 12.06. *Id.* After considering "the entire record," the ALJ found Plaintiff "has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: unskilled work that requires only limited contact with the public or coworkers." *Id.* at 16. With this

residual functional capacity ("RFC"), the ALJ found at step four that Plaintiff was able to perform work existing in significant numbers in the national economy, such as commercial cleaner, store laborer, and dishwasher. *Id.* at 20. Therefore, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act. *Id.* at 21.

## DISCUSSION AND ANALYSIS

Appealing the Commissioner's decision to deny his application for benefits, Plaintiff argues the ALJ erred in his evaluation of the medical evidence and assessing his credibility. Also, Plaintiff argues the ALJ ignored lay witness statement of his father. Further, Plaintiff contends the RFC determination was "fatally flawed" and the Step Five determination is not supported by substantial evidence in the record. (Doc. 16 at 16-26.) On the other hand, Defendant argues, "The ALJ's decision was supported by substantial evidence and free of reversible legal error." (Doc. 20 at 15.)

**A.      Evaluation of medical evidence**

In this circuit, cases distinguish the opinions of three categories of physicians: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). Generally, the opinion of a treating physician is afforded the greatest weight in disability cases, but it is not binding on an ALJ in determining the existence of an impairment or on the ultimate issue of a disability. *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). Also, an examining physician's opinion is given more weight than the opinion of a non-examining physician. 20 C.F.R. § 404.1527(d)(2).

A treating physician's opinion is not binding upon the ALJ, and may be rejected whether another physician contradicts the opinion. *Magallanes*, 881 F.2d at 751. When the opinion of a treating physician is not contradicted, an ALJ must set forth "clear and convincing" reasons to reject the opinion. *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991). An ALJ may reject a contradicted opinion of a physician with "specific and legitimate" reasons, supported by substantial evidence in the record. *Lester*, 81 F.3d at 830; *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002). If there is conflicting medical evidence, "it is the ALJ's role to determine credibility and to resolve the conflict." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). The ALJ's resolution of the conflict

must be upheld by the court when there is "more than one rational interpretation of the evidence." *Id.*; *see also Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ"). Here, because Drs. Lampe, Bilik and Garcia contradicted the opinions of Dr. Retherford and Dr. Browne, the ALJ was required to set forth specific and legitimate reasons to reject the opinions of Plaintiff's treating physicians.

### 1.    Opinions of Dr. Retherford

According to Plaintiff, "the ALJ did not give specific and legitimate reasons for rejecting Dr. Retherford's opinions and did not give Dr. Retherford's opinions the weight they warranted." (Doc. 16 at 19.) First, the ALJ observed that in November 2008, Dr. Retherford "opined the claimant qualified for permanent disability due to severe psychiatric illness." AR at 18. "[B]ecause the determination of disability is an issue reserved to the Commissioner," the ALJ gave this assessment "only slight weight." *Id.* Further, the ALJ gave the opinions of Dr. Retherford "reduced weight, because his own notes indicate the claimant was doing better as long as he took his prescribed medication." *Id.*

#### a.    Issue reserved for the Commissioner

Importantly, as Plaintiff acknowledges, the determination of whether a claimant is disabled is reserved for the Commissioner, and statements "by a medical source that [a claimant] is 'disabled' or 'unable to work'" "are not medical opinions." 20 C.F.R. §§ 404.1527(e), 416.927(e). Previously, this Court explained, "[A]n ALJ is not obligated to provide detailed reasons for rejecting a medical expert's opinion regarding the ultimate question of disability." *James v. Astrue*, 2012 U.S. Dist. LEXIS 139929, at * 25 (E.D. Cal. Sept. 27, 2012) (citing *Nyman v. Heckler*, 779 F.2d 528, 531 (9th Cir. 1985)). Dr. Retherford's belief that Plaintiff "qualifie[d] for permanent disability" is clearly a statement "that would direct the determination or decision of disability." *See* 20 C.F.R. §§ 404.1527(e), 416.927(e). Accordingly, the ALJ's decision to give "slight weight" to Dr. Retherford's statement was proper.

#### b.    Treatment notes

The Ninth Circuit explained the opinion of a treating physician may be rejected where an ALJ finds incongruity between a treating doctor's assessment and his own medical records, and the ALJ explains why the opinion "did not mesh with [his] objective data or history." *Tommasetti v. Astrue*, 533

F.3d 1035, 1041 (9th Cir. 2008); *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 603 (9th Cir. 1999) (explaining internal inconsistencies within a physician's report supports the decision to discount the opinion of a physician); *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) (ALJ permissibly rejected treating physician's opinion containing contradictory observations).

Here, Dr. Retherford opined Plaintiff's "[u]nderstanding and memory are good, but sustained concentration and persistence are limited." AR at 143. In addition, Dr. Retherford believed Plaintiff "might be capable of doing some limited type of employment, but he will probably need considerable training and close supervision." *Id.* The ALJ gave the opinions of Dr. Retherford "reduced weight" because his treatment notes indicated Plaintiff "was doing better as long as he took his prescribed medication." *Id.* at 18. Significantly, however, the ALJ fails to identify any treatment notes in which Dr. Retherford indicated Plaintiff's ability to concentrate was improved with medication. Rather, the only notes discussed by the ALJ appear address Plaintiff's mood and temper. *See id.* Accordingly, the ALJ failed to properly reject Dr. Retherford's opinion that Plaintiff had limited concentration and persistence, and could require supervision.

### 2.     Opinion of Dr. Browne

Significantly, Dr. Browne opined also that it was "impossible" for Plaintiff to maintain concentration and attention for at least two hours or handle the stress associated with an eight-hour work day. AR at 134, 137. In addition, Dr. Browne opined Plaintiff had "[n]o ability" to relate to and interact with supervisors and co-workers and that Plaintiff "would not be very good" at dealing with the public. *Id.* The ALJ noted: "I give Dr. Browne's opinion reduced weight because it does not comport with the medical evidence, and he did not begin treating the claimant until this date." *Id.* at 19. The ALJ observed that "Dr. Browne's records indicate the claimant did well on his medications." *Id.* Further, the ALJ determined he could not give the opinions of Dr. Browne "more than slight weight under the guidance of SSR 96-5p." *Id.* The ALJ explained: By using the very form used administratively by the DDS to determine whether an impairment meets a listing, Dr. Browne is expressing an opinion on an issue reserved to the Commissioner. [Citation.] Additionally, Dr. Browne is assessing a residual functional capacity, also an administrative issue reserved to the Commissioner."

*Id.* (citing SSR 96-5p). Plaintiff contends these were not specific and legitimate reasons for rejecting Dr. Browne's opinion. (Doc. 16 at 19-20.)

> ### a. *Duration of treatment relationship*

As an initial matter, the ALJ observed that Dr. Browne began treating Plaintiff on the date he offered an opinion. AR at 19. The ALJ can consider "[t]he length of the treatment relationship and the frequency of examination" in assessing a treating physician's opinion. 20 C.F.R. § 404.1527(c)(2)(i)), 416.927(c)(2)(i). Importantly, however, the Regulations "still require[] deference to the treating physician's opinions." *Orn*, 495 F.3d at 633 (citing 20 C.F.R. § 404.1527; SSR 96-2p[6]). Thus, while the ALJ could properly consider the fact that Dr. Browne had only examined and treated Plaintiff once prior to offering his opinion, this is only one factor and not a specific, legitimate reason for completely rejecting the opinions offered by Dr. Browne regarding Plaintiff's inability to maintain concentration for two-hour increments or sustain the stress of a normal workday and workweek.

> ### b. *Form of the opinions and issues reserved for the Commissioner*

The ALJ asserts that he must give Dr. Browne's opinion "more than slight weight under the guidance of SSR 96-5p" because he used "the very form used administratively by the DDS" and offered an assessment of Plaintiff's residual functional capacity. AR at 19. Pursuant to 20 C.F.R. §§ 404.1527(e) and 416.927(e), the determination of whether an individual is disabled is reserved for the Commissioner. In addition, "the final responsibility" for evaluating whether an individual satisfies a listing and determining a residual functional capacity lies with the Commissioner. *Id.* With SSR 96-5p, the Commissioner clarified these provisions, explaining:

> [S]ome issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability. The following are examples of such issues:

---

[6] Social Security Rulings are issued by the Commissioner to clarify its polices and regulations. Though they do not have the force of law, the Ninth Circuit gives the rulings deference "unless they are plainly erroneous or inconsistent with the Act or regulations." *Han v. Bowen*, 882 F.2d 1453, 1457 (9th Cir. 1989). SSR 96-2p provides in relevant part: "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927." 1996 SSR LEXIS 9 at *9-10.

1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
2. What an individual's RFC is;
3. Whether an individual's RFC prevents him or her from doing past relevant work;
4. How the vocational factors of age, education, and work experience apply; and
5. Whether an individual is "disabled" under the Act.

1996 SSR LEXIS 2 at *5.  Pursuant to SSR 96-5p, when a treating physician offers an opinion on one of these issues, it is "never entitled to controlling weight or special significance."  *Id.*  Thus, the determination of Plaintiff's RFC was reserved for the Commissioner, and discounting the *conclusion* offered by Dr. Browne, for this reason, was proper.

Significantly, however, SSR 96-5p provides also that an ALJ must consider a treating physician's assessment of what an individual can do despite his impairments. 1996 SSR LEXIS 2 at *10-15. "Although the coverall RFC assessment is an administrative finding on an issue reserved to the Commissioner, the adjudicator must nevertheless adopt in that assessment any treating source medical opinion (i.e., opinion on the nature severity of the individual's impairment(s)) to which the adjudicator has given controlling weight under the rules in 20 CRF 404.1527(d)(2) and 416.927(d)(2)." *Id.*, at *14. Thus, the ALJ must consider the assessment offered by a treating physician, even if the conclusion is a finding reserved for the Commissioner.

Here, Dr. Browne did not offer only his conclusions regarding whether Plaintiff satisfied a listed impairment, but indicated also the symptoms suffered by Plaintiff including depression, flight of ideas, and easy distractibility.  AR at 134.  Dr. Browne indicated he believed it was "impossible" for Plaintiff to maintain concentration for at least two-hour increments.  *Id.* at 137.  Further, Dr. Browne opined Plaintiff's impairment of was of an indefinite duration, and his prognosis was "very poor."  *Id.*  Such assessments are not reserved for the Commissioner, and must be considered by the ALJ.  *See, e.g., Hill v. Astrue*, 698 F.3d 1153, 1160 (9th Cir. 2012) (explaining the ALJ erred by failing to address a physician's statement that the claimant's "combination of mental and medical problems makes the likelihood of sustained full time competitive employment unlikely… [because it] was not a conclusory statement like those described in 20 C.F.R. § 404.1527(d)(1), but instead an assessment").  Consequently, discounting Dr. Browne's assessment in its entirety as issues reserved for the Commissioner was improper.  *See* 1996 SSR LEXIS 2 at *14; *Fill*, 698 F.3d at 1160.

19

1

                c.       *Consistency with other medical evidence*

2

      The ALJ concluded, "Dr. Browne's opinion… does not comport with the medical evidence."

3 AR at 19.   An ALJ may reject a medical opinion when it is "unsupported by the record as a whole."

4 *Batson v. Comm'r of the Soc. Sec. Admin.,* 359 F.3d 1190, 1195 (9th Cir. 2003); *see also Morgan*, 169

5 F.3d 595, 602-03 (9th Cir. 1999) (a medical opinion's inconsistency with the overall record constitutes

6 a legitimate reason for discounting the opinion).   To reject an opinion as inconsistent with the medical

7 record, the "ALJ must do more than offer his conclusions."  *Embrey v. Bowen*, 849 F.2d 418, 421 (9th

8 Cir. 1988).  The ALJ has a burden to "set[] out a detailed and thorough summary of the facts and

9 conflicting clinical evidence, stating his interpretation thereof, and making findings." *Cotton v.*

10 *Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1983).  Here, the ALJ failed to carry this burden.

11

      The ALJ simply offered his conclusion Dr. Browne's opinion "does not comport with the

12 medical evidence" without identifying any conflicting evidence, or addressing which portions of Dr.

13 Browne's opinion are not consistent with other medical evidence.   Moreover, the medical record

14 appears to support Dr. Browne's conclusions that Plaintiff was unable to concentrate and withstand the

15 stress of a normal workday and workweek.   As discussed above, Dr. Retherford opined Plaintiff had

16 "limited" sustained concentration and persistence.   AR at 143.   In addition, Dr. Brar noted Plaintiff

17 suffered from "inattentiveness, poor working memory, [and] significant anxiety interfering with his

18 interpersonal areas." *Id.* at 185-86.   Because the ALJ failed to explain how the opinions offered by Dr.

19 Browne were inconsistent with the medical record, this is not a legitimate reason for giving "reduced

20 weight" to the opinions of Dr. Browne.

21

                d.      *Treatment notes*

22

      As discussed above, the ALJ may reject a treating physician's opinion may when the ALJ

23 explains how the opinion is inconsistent with the doctor's own medical records.  *Tommasetti*, 533 F.3d

24 at 1041; *Morgan*, 169 F.3d at 603.  Here, the ALJ observed:

25        [B]y July 21, 2008, Dr. Browne noted Paxil had made a big difference in the claimant's
       anxiety [Ex. 5F6], and on January 21, 2008, the claimant reported his emotions were
26        better than they had been in a long time and he had had an increase in outdoor activity
       [Ex. 5F3]. The claimant was doing poorly as of November 19, 2008, because he stopped
27        his Abilify [Ex. 5F2].  In short, Dr. Browne's records indicate the claimant did well on
       his medications.
28

AR at 19.  Although the treatment notes cited by the ALJ address Plaintiff's use of medications to control Plaintiff's anxiety and mood, the ALJ fails to identify any treatment notes that conflict with Dr. Browne's opinion that Plaintiff lacked the ability to concentrate or focus, or to sustain the stress of a workday or workweek.  Consequently, the treatment notes do not support the ALJ's decision to give less weight to the entirety of the opinions offered by Dr. Browne simply because he believed the notes were inconsistent with Dr. Browne's opinions.

Because the ALJ failed to identify specific and legitimate reasons for giving "reduced weight" to the opinions of Dr. Browne, particularly related to Plaintiff's ability to concentrate and sustain the stress of a normal workday and workweek, the ALJ erred in his evaluation of the medical evidence. *See Lester*, 81 F.3d at 830; *Thomas*, 278 F.3d at 958-59.

**B.    Credibility of Plaintiff's Testimony**

In assessing credibility, an ALJ must determine first whether objective medical evidence shows an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)). Second, if there is no evidence of malingering, the ALJ must make specific findings as to the claimant's credibility by setting forth clear and convincing reasons for rejecting his subjective complaints. *Id.* at 1036.

An adverse credibility determination must be based on clear and convincing evidence where there is no affirmative showing the claimant is malingering and "the record includes objective medical evidence establishing that the claimant suffers from an impairment that could reasonably produce the symptoms of which he complains." *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008). The ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester*, 81 F.3d at 834. Factors that may be considered include, but are not limited to: (1) the claimant's reputation for truthfulness; (2) the claimants daily activities; (3) an unexplained, or inadequately explained, failure to seek treatment or follow a prescribed treatment (4) inconsistencies in testimony or between testimony and conduct; and (5) testimony from physicians concerning the nature, severity, and effect of the symptoms of which the claimant complains. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *see also Thomas*, 278 F.3d at 958-59.

21

Here, although the ALJ found "the medical evidence of record documents a long history of treatment for [Plaintiff's] medically determinable impairments," he determined Plaintiff was "less than fully credible." AR at 17. Supporting these findings, the ALJ considered statements he believed to be contradictory, Plaintiff's activities, and the objective medical evidence. *Id.*

### 1. Inconsistencies in Plaintiff's testimony

An ALJ may consider "ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid." *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996). Here, the ALJ opined Plaintiff's testimony was "fraught with contradictions" and explained:

> [Plaintiff] testified that, due to his mental impairments, he had poor memory, could not cope with changes and broke down when they occurred, became panicked easily, could not control himself about half the time, has difficulty getting along with others or being around people, constantly feels as though his heart will explode and his mind is paralyzed, and has been taking psychiatric medications since age 6, but cannot afford them at this time and relies on the kindness of his physicians whom he sees every 3 to 6 months. The claimant lives in a trailer on his family's property, relies on them for sustenance, and tries to help them, but struggles to do anything now and often does nothing. He calms his mind by obsessively learning about history. He will get on a bus to get out of the trailer and/or see several college friends in town and enjoys talking to people and listening to them, contrary to his testimony that he cannot socialize or be around people, and helping them by remembering things, contrary to his testimony of poor memory. He can only do things when relaxed enough and cannot remember under stress.

AR at 17. By summarizing the testimony in this manner, the ALJ fails to distinguish the statements Plaintiff made about his *memory* from those dealing with his *concentration*. Indeed, Plaintiff testified, "I may not be able to work or concentrate for very long, . . . but I'm able to remember things." *Id.* at 311. Likewise, Plaintiff said he liked to read and enjoyed studying history, but could not "concentrate for more than . . . 20 minutes – at any given thing." *Id.* at 236, 279-80. Further, Plaintiff testified that he does not like to be around "large crowds." *Id.* at 291. Although Plaintiff said he rode the bus, he also stated that he rarely talked to anyone on the bus, could only ride for 45 minutes at a time because "[a]ny longer than that and it seems…[he] will just start going crazy." *Id.* at 314. The "contradictions" the ALJ purports to identify do not support an adverse credibility determination.

### 2. Plaintiff's activities

When a claimant spends a substantial part of the day "engaged in pursuits involving the

22

performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit a claimant's allegations." *Morgan*, 169 F.3d at 600 (citing *Fair*, 885 F.2d at 603). For example, a claimant's ability to cook, clean, do laundry and manage finances may be sufficient to support an adverse finding find of credibility. *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008); *see also Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) (the ALJ found the claimant lacked credibility where her activities "suggest she is quite functional. She is able to care for her own personal needs, cook, clean and shop. She interacts with her nephew and boyfriend."). Likewise, an ALJ may conclude that "the severity of…limitations were exaggerated" when a claimant exercises, gardens, and participates in community activities. *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 693 (9th Cir. 2009). However, an ALJ must make a specific finding relating to the transferability of the activities to a workplace to refute a plaintiff's allegations of disability. *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007).

As Defendant observes, "The ALJ noted Plaintiff lived on his own, used public transportation and had some friends from college." (Doc. 20 at 12, citing AR at 17, 311.) However, the Ninth Circuit has made clear that the mere fact a claimant engages in normal daily activities "does not in any way detract from [his] credibility as to [his] overall disability." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001). The Court continued, "One does not need to be 'utterly incapacitated' in order to be disabled." *Id.* (quoting *Fair*, 885 F.2d at 603). Rather, an ALJ must make a determination as to whether daily activities are transferrable to a workplace. *See Orn*, 495 F.3d at 639 (the ALJ erred in failing to "meet the threshold for transferable work skills, the second ground for using daily activities in credibility determinations"). The ALJ failed to find Plaintiff's limited activities could be transferred to a work setting, or determine whether Plaintiff spent a "substantial" part of his day engaged in such activities. Thus, Plaintiff's activities of daily living were not clear and convincing evidence to discount his credibility. *See Lewis v. Apfel*, 236 F.3d 503, 517 (9th Cir. 2001) (limited activities did not constitute convincing evidence that the claimant could function regularly in a work setting).

3.      Objective medical evidence

In general, "conflicts between a [claimant's] testimony of subjective complaints and the objective medical evidence in the record" can constitute "specific and substantial reasons that

undermine... credibility." *Morgan*, 169 F.3d at 600.  The Ninth Circuit explained, "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); *see also Burch*, 400 F.3d at 681 ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis"); 1996 SSR LEXIS 4, at *2-3 (the ALJ "must consider the entire case record, including the objective medical evidence" in determining credibility, but statements "may not be disregarded solely because they are not substantiated by objective medical evidence").

Here, the ALJ did not base the decision solely on the fact that the medical record did not support the degree of symptoms alleged by Plaintiff.  Thus, the objective medical evidence was a relevant factor in determining Plaintiff's credibility.  However, in citing to the medical evidence as part of a credibility determination, it is not sufficient for the ALJ to make a simple statement that the record contradicts the testimony.  *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) ("general findings are an insufficient basis to support an adverse credibility determination"). Rather, an ALJ must "specifically identify what testimony is credible and what evidence undermines the claimant's complaints." *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006); *see also Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993) (an ALJ "must state which . . . testimony is not credible and what evidence suggests the claimants are not credible").  Here, the ALJ failed to identify the portions of Plaintiff's credibility he found to be undermined by the medical record.  Consequently, the objective medical record does not support the adverse credibility determination.

**B.     Remand is appropriate in this action**

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate payment of benefits is within the discretion of the District Court.  *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000).  Except in rare instances, when a court reverses an administrative agency determination, the proper course is to remand to the agency for additional investigation or explanation.  *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004) (citing *INS v. Ventura*, 537 U.S. 12, 16 (2002)).  Generally, an award of benefits is directed when:

1   (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence,
2   (2) there are no outstanding issues that must be resolved before a determination of
   disability can be made, and (3) it is clear from the record that the ALJ would be
3   required to find the claimant disabled were such evidence credited.

4   *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996).  In addition, an award of benefits is directed

5   when no useful purpose would be served by further administrative proceedings, or where the record has

6   been fully developed.  *Varney v. Sec'y of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir. 1988).

7        Applying the *Smolen* factors to this case, the ALJ failed to set forth legally sufficient reasons to

8   properly reject the opinions of Plaintiff's treating physicians, particularly related to Plaintiff's poor

9   working memory, inattentiveness, inability to concentrate, and inability to sustain the stress of working

10   eight-hours a day.  These opinions are intertwined with RFC determination of the ALJ and the

11   questions posted to a vocational expert to determine Plaintiff's ability to perform work in the national

12   economy.

13        Further, the ALJ failed to properly reject Plaintiff's subjective complaints.  The Ninth Circuit

14   explained that "where the ALJ improperly rejects the claimant's testimony regarding his limitations,

15   and the claimant would be disabled if his testimony were credited," the testimony be can credited as

16   true, and remand is not appropriate.  *Lester*, 81 F.3d at 834; *Smolen*, 80 F.3d at 1292.  However, courts

17   retain flexibility in crediting testimony as true.  *Connett v. Barnhart*, 340 F.3d 871, 876 (9th Cir. 2003)

18   (remanding for further determinations where there were insufficient findings as to whether the

19   plaintiff's testimony should be credited as true).  A remand for further proceedings regarding the

20   credibility of a claimant is an appropriate remedy.  *See, e.g., Bunnell*, 947 F.2d at 348 (affirming the

21   district court's order remanding for further proceedings where the ALJ failed to explain with sufficient

22   specificity the basis for rejecting the claimant's testimony); *Byrnes v. Shalala*, 60 F.3d 639, 642 (9th

23   Cir. 1995) (remanding the case "for further proceedings evaluating the credibility of [the claimant's]

24   subjective complaints . . .").  Based upon the record, remand is appropriate in this matter.

25   <u>**CONCLUSION AND ORDER**</u>

26        For the reasons set forth above, the Court finds the ALJ erred in assessing the opinions of

27   Plaintiff's treating physicians, Drs. Retherford and Browne.  In addition, the ALJ failed to set forth

28   findings "sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's

testimony on permissible grounds." *Moisa v. Barnhart*, 367 F.3d 882, 885 (9th Cir. 2004).  As a result, the administrative decision should not be upheld by the Court.  *See Sanchez*, 812 F.2d at 510. Because the Court finds remand is appropriate on these matters, it declines to address the remaining issues raised by Plaintiff in his opening brief.

Accordingly, **IT IS HEREBY ORDERED**:

1.  Pursuant to sentence four of 42 U.S.C. § 405(g), this matter is **REMANDED** for further proceedings consistent with this decision; and

2.  The Clerk of Court **IS DIRECTED** to enter judgment in favor of Plaintiff Jarrod Hoefle and against Defendant Carolyn Colvin, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   **February 27, 2014**              **/s/ Jennifer L. Thurston**
UNITED STATES MAGISTRATE JUDGE